**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF VIRGINIA**
**Richmond Division**

| | |
|---|---|
| MARIA DE LOURDES TESTER, a Florida resident, and TRACY ELIZABETH MASI, a Virginia resident, individually, and on behalf of all others similarly situated, | |
| Plaintiffs, | Case No. 3:19-cv-579 |
| v. | **CLASS ACTION COMPLAINT** |
| CAPITAL ONE FINANCIAL CORPORATION, CAPITAL ONE, N.A., and CAPITAL ONE BANK (USA) | **JURY TRIAL DEMANDED** **INJUNCTIVE RELIEF DEMANDED** |
| Defendants. | |

## CLASS ACTION COMPLAINT

Plaintiff **Maria de Lourdes Tester and Plaintiff Tracy Elizabeth Masi** ("Plaintiffs"), on behalf of themselves and all others similarly situated, hereby brings this action against Defendants, Capital One Financial Corporation, Capital One, N.A. and Capital One Bank (USA) (collectively, "Capital One" or "Defendants").

## NATURE OF CLAIM

1.      Plaintiffs bring this class action against Capital One for its failure to exercise reasonable care in securing and safeguarding consumers' sensitive personal information, including the names, addresses, phone numbers, dates of birth, credit scores, credit limits, account balances, payment histories, social security numbers, and bank account numbers (collectively, "PII").

2.      On July 29, 2019, Capital One announced that on "July 19, 2019, it determined

there was unauthorized access by an outside individual who obtained certain types of personal information [i.e., PII] relating to people who had applied for its credit card products and to Capital One credit card customers."[1]

3.     The United States Federal Bureau of Investigations ("FBI") reported that PII was accessed via Capital's One's faulty firewalls that allowed the hacker, Paige Thompson, to access Capital One's cloud repository and acquire the PII of approximately 100 million consumers in or around March 2019 (the "Data Breach").[2]

4.     Thompson posted the PII of these approximate 100 million consumers to her GitHub account on April 21, 2019, which was free and available for any user on the internet to download and further exploit.[3]   Nonetheless, it was not until July 29, 2019, that Capital One made the information of their firewall being breached to the public.

5.     In addition to Capital One's failure to prevent the Data Breach, Capital One also failed to detect the breach for approximately three months.

6.     Upon information and belief, the posted PII of approximately 100 million consumers on Thompson's GitHub account remained exposed until at least July 17, 2019, when an unidentified tipster informed Capital One of the posting by emailing the bank's responsible disclosure address with a brief warning and a link to the GitHub address.[4]

---

[1] *Overveiw – Frequently Asked Questions,* Capital One, (July 29, 2019),  Available at https://www.capitalone.com/facts2019/ (hereinafter "Breach Notification").
[2] Harrer, Andrew, *The Alleged Capital One Hacker Didn't Cover Her Tracks,* Wired (July 29, 2019). Available  at https://www.wired.com/story/ca pital-one-hack-credit-card-a pplication-data/.

[3] *Id.*

[4] *Id.*

7.    The Data Breach was caused by Capital One's inadequate approach to data security and protection of PII that it collected during the course of its business.

8.    The deficiencies in Capital One's data security and firewall were so significant that the firewall permitted access to any consumer or small business that applied for one of Capital One's credit card products from through early 2019-approximately fourteen years of data left unprotected and exposed for any malicious actor to access, download, and exploit.[5]

9.    Capital One disregarded the rights of Plaintiff and the Class (defined below) by: intentionally, willfully, recklessly, or negligently failing to take adequate and reasonable measures to ensure its data systems were protected; failing to disclose to its customers the material fact that it did not have adequate computer systems and security practices to safeguard customer PII; failing to take available steps to detect and prevent the Data Breach; failing to monitor and timely detect the Data Breach; and failing to provide Plaintiffs and the Class prompt and accurate notice of the Data Breach.

10.    As a result of Capital One's Data Breach, Plaintiffs' and Class members' PII have been exposed to criminals for misuse. The injuries Plaintiffs and the Class suffered as a direct result of the Data Breach include, but are not limited to:

a.    theft of personal and financial information;

b.    costs associated with the detection and prevention of identity theft and unauthorized use of financial accounts;

c.    damages arising from the inability to use debit or credit card accounts because accounts were suspended or otherwise rendered unusable as a result of fraudulent charges

---

[5] Breach Notification, *Supra* n.1.

stemming from the Data Breach, including but not limited to foregoing cash back rewards;

  d. damages arising from the inability to withdraw or otherwise access funds because accounts were suspended, restricted, or otherwise rendered unusable as a result of the Data Breach, including, but not limited to, missed bill and loan payments, late-payment charges, and lowered credit scores and other adverse impacts on credit;

  e. costs associated with spending time to address and mitigate the actual and future consequences of the Data Breach such as finding fraudulent charges, cancelling and reissuing payment cards, purchasing credit monitoring and identity theft protection services, imposition of withdrawal and purchase limits on compromised accounts, including, but not limited to, lost productivity and opportunities, time taken from the enjoyment of one's life, and the inconvenience, nuisance and annoyance of dealing with all issues resulting from the Data Breach;

  f. the imminent and certainly impending injury resulting from the potential fraud and identity theft posed by PII being exposed for theft and sale on the dark web;

  g. damages to and diminution in value of PII entrusted to Capital One for the sole purpose of purchasing products and services from Capital One; and

  h. the loss of Plaintiffs' and Class members' privacy.

  11. The injuries Plaintiffs and the Class suffered were directly and proximately caused by Capital One's failure to implement or maintain adequate data security measures for PII.

  12. Plaintiffs and the Class retain a significant interest in ensuring that their PII, which remain in Capital One's possession, are protected from further breaches, and seek to remedy the harms suffered as a result of the Data Breach for themselves and on behalf of similarly situated consumers whose PII was stolen.

  13. Plaintiffs, individually and on behalf of similarly situated consumers, seek to

recover damages, equitable relief, including injunctive relief designed to prevent a reoccurrence of the Data Breach and resulting injuries, restitution, disgorgement, reasonable costs and attorneys' fees, and all other remedies this Court deems proper.

## PARTIES

14.  Plaintiff Maria de Lourdes Tester resides in Miami, Florida, and is a citizen of Florida.

15.  Plaintiff Tracy Elizabeth Masi resides in Virginia Beach and is a citizen of Virginia.

16.  Defendant Capital One Financial Corporation is a Delaware corporation with its principal place of business located at 1680 Capital One Drive, McLean, Virginia. It offers a broad spectrum of financial products and services to consumers including credit cards and is among the biggest banks in the United States with $373.6 billion in total assets as of 2019. Capital One Financial Corp. operates through its two primary subsidiaries Capital One Bank (USA) and Capital One, N.A.

17.  Capital One Bank (USA), National Association is one of Capital One Financial Corporation's two principal subsidiaries. It offers a variety of credit and debit card products to consumers.

18.  Capital One, National Association is one of Capital One Financial Corporation's two principal subsidiaries. It offers a broad spectrum of banking products and financial services to consumers small businesses and commercial clients.

## JURISDICTION AND VENUE

19.  This Court has jurisdiction pursuant to 28 U.S.C. § 1332(d)(2) ("The Class Action Fairness Act") because sufficient diversity of citizenship exists between parties in this

action, the aggregate amount in controversy exceeds $5,000,000, exclusive of interests and costs, and there are 100 or more members of the Class, pursuant to Capital One's admission that approximately 100,000,000 consumers were affected by the Data Breach.

20.    This Court has personal jurisdiction over Capital One because its principal place of business is in the Eastern District of Virginia, and Capital One is authorized to and regularly conducts business in the Eastern District of Virginia.

21.    Venue is proper in this District pursuant to 28 U.S.C. § 139l(b)(l) & (2) because Capital One is a corporation, has its principal place of business in this District, and a substantial part of the events and omissions giving rise to this action occurred in this District.

## FACTUAL ALLEGATIONS

### A.  The Banking System is a Constant Target for Malicious Actors

22.    Data breaches have become widespread. In 2016, the number of U.S. data breaches surpassed 1,000, representing a record high and a forty percent increase from the previous year.[6]  In 2017 a new record high of 1,579 breaches was reached representing a 44.7% increase over 2016.[7] The banking sector remained a high target among cyber criminals with 135 data breaches in 2018 alone.[8]

23.    "The risk of cyberattack on financial services firms cannot be overstated" as

---

[6]  Identity Theft Resource Center, *Data Breaches Increase 40 Percent in 2016, Finds New Report From Identity Theft Resource Center and CyherScout* (Jan. 19, 2017), *available at* https://www.idtheftcenter.org/surveys-studys/ (last visited August 10, 2019).

[7] Identity Theft Resource Center, 2017 Annual Data Breach Year-End Review, available at https://www.idtheftcenter.org/2017-data-breaches/ (last visited August 10, 2019).

[8] Identity Theft Resource Center, End of Year Data Breach Report (2018). Available at https://www.idtheftcenter.org/2018-data-breaches/.

financial services companies "fall victim to cybersecurity attacks 300 times more frequently than businesses in other industries."[9] Indeed, "financial institutions have long been a lucrative target for cybercriminals because of the massive volumes of data and money that can be stolen."[10] A recent study from the cybersecurity firm Intsights confirmed that the Banking and Financial sectors were hit with a constant stream of cyber-attacks when compared to other sectors.[11]

24.    The consequences to affected consumers are significant as sensitive personal and financial information is exposed. It is further exacerbated when, as here, compromised PII includes Social Security numbers which make it possible for thieves to file fraudulent tax returns, file for unemployment benefits, or apply for a job using a false identity.[12] Each of these fraudulent activities is difficult to detect and may not be uncovered until the number has been used in a fraudulent transaction. Moreover, it is no easy task to change or cancel a stolen Social Security number. Even then, a new Social Security number may not be effective,

---

[9] Forbes, *Laughing All The Way To The Bank: Cybercriminals Targeting U.S. Financial Institutions,* August 28, 2018. Available at https://www.forbes.com/sites/bhaktimirchandani/2018/08/28/laughing-all-the-way-to-the-bank-cybercriminals-targeting-us-financial-institutions/#1aaa79c76e90

[10] Help Net Security, *Increasing number of financial institutions falling prey to cyber Attacks,* November 9, 2016. Available at https://www.helpnetsecurity.com/2016/11/09/financial-institutions-cyber-attacks/

[11] CISO MAG, Banking and Financial sectors are prime target for hackers, May 3, 2019 https://www.cisomag.com/banking-and-financial-sectors-are-prime-target-for-hackers-survey/ (last viewed August 10, 2019).

[12] The United States Government Accountability Office explained that theft involving social security numbers is the most insidious not only because it often takes time for the victim to become aware of the theft, but that as a result they will often face "substantial costs and inconveniences repairing damage to their credit records ...[and their] good name." Data Breaches are Frequent, but Evidence of Resulting Identity Theft is Limited; However, the Full Extent is Unknown, GAO (June 2007), available at https://www.gao.gov/new.items/d07737.pdf (the "GAO Report")(last visited August 10, 2019).

as "[t]he credit bureaus and banks are able to link the new number very quickly to the old number, so all of that old bad information is quickly inherited into the new Social Security number."[13]

25.    Capital One knew the importance of safeguarding customer PII entrusted to it and of the foreseeable consequences if its data security systems were to be breached, including the significant costs that would be imposed on its customers as a result of a breach.

**B.  Plaintiffs Transaction with Capital One.**

26.    Plaintiff Tester had a credit card with Capital One for years prior to the Data Breach.

27.    Plaintiff Masi applied for a credit card with Capital One in May 2014 and had the card for years prior to the Data Breach.

28.    Since the announcement of the Data Breach, Plaintiffs continue to monitor their accounts in an effort to detected and prevent any misuses of his personal information.

29.    Plaintiffs have, and continue to, spend their valuable time to protect the integrity of their finances and credit -time which she would not have had to expend but for the Data Breach.

30.    Plaintiffs would not have applied for a credit card with and provided PII to Capital One during the period of the Data Breach had Capital One disclosed that it lacked adequate computer systems and data security practices to safeguard consumers' PII from theft.

31.    Plaintiffs suffered actual injury from having their PII stolen as a result of the Data Breach.

32.    Plaintiffs suffered actual injury and damages in paying money to, and

---

[13] *Victims of Social Security Number Theft Find It's Hard to Bounce Back,* NPR, Brian Naylor, Feb. 9, 2015, *available at* http://www.npr.org/2015/02/09/384875839/data-stolen-by-anthem-s-hackers-has-millions-worrying-about-identity-theft (last visited August 10, 2019).

purchasing products through, Capital One's business during the Data Breach (e.g., paying interest on credit cards, paying minimum balance fees, and other banking fees), expenditures which he would not have made with Capital One had Capital One disclosed that it lacked computer systems and data security practices adequate to safeguard consumers' PII from theft.

33.    Plaintiffs suffered actual injury in the form of damages to and diminution in the value of their PII-a form of intangible property that the Plaintiffs entrusted to Capital One for the purpose of applying for and using Capital One's products, which was compromised in and as a result of the Data Breach.

34.    Plaintiffs suffered lost time, annoyance, interference, and inconvenience as a result of the Data Breach, and has concerns for the loss of their privacy.

35.    Plaintiffs have suffered imminent and impending injury arising from the substantially increased risk of fraud, identity theft, and misuse resulting from their PII being placed in the hands of criminals.

36.    Plaintiffs have a continuing interest in ensuring their PII, which remains in the possession of Capital One, is protected and safeguarded from future breaches.

### C. Capital One's Customer Data Collection Practices

37.    Capital One is a for-profit corporation and one of the largest banking institutions in the United States.

38.    As part of applying for a credit card and other financial services, consumers provide banks their names, addresses, social security numbers, and other valuable, sensitive, and private PII.

39.    At all relevant times, Capital One was well-aware, or reasonably should have been aware, that the PII collected, maintained, and stored from the applications is highly

sensitive, susceptible to attack, and could be used for wrongful purposes by third parties, such as identity theft and fraud.

40.    Banking repositories and databases are popular targets for cyberattacks, especially given the extremely sensitive nature of the PII stored on those repositories and databases. The frequency and prevalence of attacks make it imperative that banks such as Capital One routinely monitor for exploits and cyberattacks and regularly update their software and security procedures.

41.    Such exploits can go undetected for a long period of time, especially if industry best practices are not routinely used.

42.    PII is a valuable commodity. A "cyber black market" exists in which criminals openly post stolen payment card numbers, social security numbers, and other personal, private information on multiple underground Internet websites. PII is valuable to identity thieves because they can use victims' personal data-including PII-to open new financial accounts and take out loans in another person's name, incur charges on existing accounts, or clone ATM, debit, and credit cards.

43.    This is especially true for banks, given that the PII disclosed in this Data Breach was precisely the PII Capital One requested to process and, in some cases, approve consumers for credit cards and other banking products.

44.    Legitimate organizations and the criminal underground alike recognize the value of PII contained in a data systems; otherwise, the latter would not aggressively seek or pay for it. For example, in "one of 2013's largest breaches . . . not only did hackers compromise the [card holder data] of three million customers, they also took registration data [containing PII] from 38

million users."[14]

45.    Professionals tasked with trying to stop fraud and other misuse know that PII have real monetary value in part because criminals continue their efforts to obtain this data. In other words, if any additional breach of sensitive data did not have incremental value to criminals, one would expect to see a reduction in criminal efforts to obtain such additional data over time. However, just the opposite has occurred. For example, the Identity Theft Resource Center reported 1,579 data breaches in 2017, which represents a 44.7 percent increase over the record high figures reported for 2016.[15]

46.    The PII of consumers remains of high value to identity criminals, as evidenced by the prices criminals will pay through black-market sources, or what is often called the dark web. Numerous sources cite dark web pricing for stolen identity credentials. For example, a complete set of bank account credentials can fetch a thousand dollars or more (depending on the associated credit score or balance available to criminals).[16] Experian reports that a stolen credit or debit card number can sell for $5 to $110 on the dark web.[17]

47.    At all relevant times, Capital One knew, or reasonably should have known,

---

[14] Verizon 2014 PCI Compliance Report,
https://www.cisco.com/c/dam/en_us/solutions/industries/docs/retail/verizon_pci2014.pdf

[15] *2017 Annual Data Breach Year-End Review,* IDTheftCenter (2017),
https://www.idtheftcenter.or g/2017-data-breaches.

[16] *Here's How Much Thieves Make By Selling Your Personal Data Online, Business Insider,*
http://www.businessinsider.com/heres-how-much-   your-personal-data-costs-on-the-dark-web-
2015-5, May 27, 2015.

[17] *Here's How Much Your Personal Information Is Selling for on the Dark Web*
https://www.ex perian.com/blo gs/ask-experian/heres-how-much-  your-personal-information-
is-   selling-for-on-the-dark-web/.

of the importance of safeguarding PII, and of the foreseeable consequences that would occur if its data security system was breached, including, specifically, the significant costs that would be imposed on its customers as a result of a breach.

48.     Capital One was, or should have been, fully aware of the significant volume of daily online credit applications, amounting to tens of thousands of daily interactions with consumers' PII, and thus, the significant number of individuals who would be harmed by a breach of Capital One's systems.

49.     Unfortunately, and as alleged below, despite all of this publicly available knowledge of the continued compromises of PII in the hands of other third parties, such as banking institutions, retailers, and restaurant chains, Capital One's approach to maintaining the privacy and security of Plaintiffs' and Class members' PII was lackadaisical, cavalier, reckless, or at the very least, negligent.

### D. The Capital One Data Breach

50.     On July 29, 2019, Capital One admitted to one of the largest data breaches in history, in which more than 100 million US consumers were affected.[18] The Data Breach notice stated in relevant part:

Capital One Announces Data Security Incident

\* \* \*

MCLEAN, Va., July 29, 2019 /PRNewswire/ -- Capital One Financial Corporation (NYSE: COF) announced today that on July 19, 2019, it determined there was unauthorized access by an outside individual who obtained certain types of personal information relating to people who had applied for its credit card products and to Capital One credit card customers.

\* \* \*

---

[18] Breach Notification, *Supra*. n.1.

Based on our analysis to date, this event affected approximately 100 million individuals in the United States and approximately 6 million in Canada.

\* \* \*

The largest category of information accessed was information on consumers and small businesses as of the time they applied for one of our credit card products from 2005 through early 2019. This information included personal information Capital One routinely collects at the time it receives credit card applications, including names, addresses, zip codes/postal codes, phone numbers, email addresses, dates of birth, and self-reported income. Beyond the credit card application data, the individual also obtained portions of credit card customer data, including:

• Customer status data, e.g., credit scores, credit limits, balances, payment history, contact information.

• Fragments of transaction data from a total of 23 days during 2016, 2017 and 2018.

\* \* \*

• About 140,000 Social Security numbers of our credit card customers.

• About 80,000 linked bank account numbers of our secured credit card customers.

\* \* \*

We will notify affected individuals through a variety of channels. We will make free credit monitoring and identity protection available to everyone affected.

Safeguarding our customers' information is essential to our mission and our role as a financial institution. We have invested heavily in cybersecurity and will continue to do so. We will incorporate the learnings from this incident to further strengthen our cyber defenses.

For more information about this incident and what Capital One is doing to respond, visit www.capitalone.com/facts2019. In Canada, information can be found at www.capitalone.ca/facts201 9 and www.capitalone.ca/facts2019/fr. The investigation is ongoing and analysis is subject to change. As we learn more, we will update these websites to provide additional information.[19]

---

[19] Capital One Announces Data Security Incident ("Security Incident"), Available at http://press.capitalone.com/ phoenix.zhtml?c=251626& p=irol-newsArticle_pf&ID=2405043

51.    The Capital One Data Breach occurred because Capital One failed to secure the PII of approximately 100 million consumers in Capital One's cloud-based repository and database.[20]

52.    Capital One also reported that the Data Breach impacted consumers who applied for Capital One credit card products from 2005 through "early 2019," with information that included "personal information Capital One routinely collects at the time it receives credit card applications, including names, addresses, zip codes/postal codes, phone numbers, email addresses, dates of birth, and self-reported income."[21]

53.    In addition to the aforementioned "routine" collections, Capital One also admitted consumers' credit scores, credit limits, balances, payment histories, contact information, and "fragments of transaction data from a total of 23 days during 2016, 2017 and 2018."[22]

54.    Capital One further admitted that "about 140,000 Social Security numbers of [its] credit card customers" and "about 80,000 linked bank account numbers of our secured credit card customers" were also disclosed in the Data Breach.[23]

55.    At no point did Capital One offer any concrete assistance or offer to remunerate Plaintiffs or the Class for its negligence. Despite acknowledging that the PII

---

[20] Breach Notification, *Supra*. n.1.

[21] Breach Notification, *Supra*. n.1.
[22] Breach Notification, *Supra*. n.1.

[23] Breach Notification, *Supra*. n.1.

was stolen by a malicious actor and placed on the Internet for anyone to access, download, and use, Capital One attempted to downplay the gravity of breach claiming "it is unlikely that the information was used for fraud or disseminated by this individual."[24]

56.      This PII was compromised due to Capital One's acts and omissions and its failure to properly protect the PII, despite being aware of cybersecurity standards, industry best practices, and the vulnerability of financial service institutions to attack. *See e.g.* Equifax.[25]

57.      In addition to its failure to prevent the Data Breach, Capital One also failed to detect the breach for at least three months-despite it being publicly represented on the popular and often trafficked GitHub website.[26] Intruders, therefore, had at least three months to access, collect, download, and make use of this information for fraudulent and other malicious purposes.

58.      During this time, Capital One failed to recognize its systems had been breached and that intruders were stealing the PII of 100 million credit card applicants. Indeed, the breach was not even discovered as a result of Capital One's diligence or their internal cyber security systems, but rather by a third party who "sent a message to the company's responsible disclosure email address with a link to the GitHub page."[27]

59.      While timely action by Capital One in identifying the Breach would likely have

---

[24] Security Incident, *Supra.* n.15.

[25] 2017 Cybersecurity Incident & Important Consumer Information. Available at https://www.equifaxsecurit y2017.com/consumer-notice/.

[26] CNET, *Capital One data breach involves J OO million credit card applications.* Available at https://www.cnet.com/news/capital-one-data-breach-involves-100-million-credit-card-applications/ (Thompson [the hacker] allegedly posted details about the hack on a GitHub page in April, and talked about the attack on Twitter and Slack discussions, according to the FBI. The page had been up since April 21, with the IP address for a specific server containing the company's sensitive data.)

[27] *Id.*

significantly reduced the harmful consequences, instead, their inaction and negligence contributed to the scale of the Data Breach and the resulting damages to Plaintiffs and Class members.

**E.    Defendants' Privacy Policies and Agreements to Keep PII Confidential**

60.    As a condition of credit, Capital One required applicants to provide them with certain personal information. In their ordinary course of business, Defendants maintained this personal information, including, but not limited to, names, addresses, dates of birth and Social Security numbers.

61.    By obtaining, collecting, using, and deriving a benefit from Plaintiffs' and the Class members' PII, Defendants assumed legal and equitable duties to those individuals. Defendants knew or should have known that they were responsible for protecting Plaintiffs and Class members' PII from disclosure. At all relevant times, Plaintiffs and the Class members have taken reasonable steps to maintain the confidentiality of their PII.

62.    Plaintiffs and the Class members, as credit card applicants, relied on Defendants to keep their PII confidential and securely maintained, to use this information for business purposes only, and to make only authorized disclosures of this information.

63.    In addition to their obligations under the law, Capital One independently and routinely promised to safeguard PII. Examples include:

> "To protect your personal information from unauthorized access and use, we use security measures that comply with federal law. These measures include computer safeguards and secured files and buildings."[28]

> Capital One understands how important security and confidentiality are to our customers, so we use the following security techniques, which comply with or even exceed federal regulatory requirements to protect information about you. . . .[29]

---

[28] https://www.capitalone.com/bank/privacy/

[29] https://www.capitalone.com/identity-protection/privacy/faq

At Capital One, we make your safety and security a top priority and are committed to protecting your personal and financial information. If we collect identifying information from you, we will protect that information with controls based upon internationally recognized security standards, regulations, and industry-based best practices.[30]

### F. Capital One Failed to Comply with Federal Requirements

64.    The Federal Trade Commission ("FTC") has issued numerous guides for business highlighting the importance of reasonable data security practices. According to the FTC, the need for data security should be factored into all business decision-making.[31]

65.    In 2016, the FTC updated its publication, *Protecting Personal Information: A Guide for Business,* which established guidelines for fundamental data security principles and practices for business. The guidelines note businesses should protect the personal customer information that they keep; properly dispose of personal information that is no longer needed; encrypt information stored on computer networks; understand their network's vulnerabilities; and implement policies to correct security problems. The guidelines also recommend that businesses use an intrusion detection system to expose a breach as soon as it occurs; monitor all incoming traffic for activity indicating someone is attempting to hack the system; watch for large amounts of data being transmitted from the system; and have a response plan ready in the event of a breach.

66.    The FTC recommends that companies not maintain PII longer than is needed for authorization of a transaction; limit access to sensitive data; require complex passwords

---

[30] https://www.capitalone.com/identit y-protection/privacy/statement

[31] Federal Trade Commission, *Start With Security,* available at https://www.ftc.gov/system/files/documents/plain-language/pdf0205-startwithsecurity.pdf.

to be used on networks; use industry-tested methods for security; monitor for suspicious activity on the network; and verify that third-party service providers have implemented reasonable security measures.[32]

67.    The FTC has brought enforcement actions against businesses for failing to adequately and reasonably protect customer data, treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5 of the Federal Trade Commission Act ("FTCA"), 15 U.S.C. § 45. Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.

68.    Capital One's failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data (i.e., PII) constitutes an unfair act or practice prohibited by Section 5 of the FTC Act, 15 U.S.C. § 45.

69.    In this case, Capital One was at all times fully aware of its obligation to protect the financial data, including PII, of Capital One's applicants because of its existence a one of the United States' largest financial institutions. Capital One was also aware of the significant repercussions if it failed to do so because Capital One collected applicant data from millions of consumers monthly (if not daily) and they knew that this data, if hacked, would result in injury to consumers, including Plaintiffs and Class members.

### G.    The Data Breach Caused Harm and Will Result in Additional Fraud

70.    The ramifications of Defendant's failure to keep Patients' PII secure are long lasting and severe. Once PII is stolen, fraudulent use of that information and damage to victims may continue for years.

---

[32] FTC, *Start With Security*, *supra*. n. 31

71.     The FTC defines identity theft as "a fraud committed or attempted using the identifying information of another person without authority." The FTC describes "identifying information" as "any name or number that may be used, alone or in conjunction with any other information, to identify a specific person."[33]

72.     Identity thieves can use PII, such as that of Plaintiffs and Class members, which Capital One failed to keep secure, to perpetrate a variety of crimes that harm victims. For instance, identity thieves may commit various types of government fraud such as: immigration fraud; obtaining a driver's license or identification card in the victim's name but with another's picture; using the victim's information to obtain government benefits; or filing a fraudulent tax return using the victim's information to obtain a fraudulent refund.

73.     As a result of Capital One's delay in detecting and notifying consumers of the Data Breach, the risk of fraud for Plaintiffs and Class members has been driven even higher.

74.     Moreover, reimbursing a consumer for a financial loss due to fraud does not make that individual whole again. On the contrary, identity theft victims must spend numerous hours and their own money repairing the impact to their credit. After conducting a study, the Department of Justice's Bureau of Justice Statistics ("BJS") found that identity theft victims "reported spending an average of about 7 hours clearing up the issues" and resolving the consequences of fraud in 2014.[34]

75.     An independent financial services industry research study conducted for BillGuard-a private enterprise that automates the consumer task of finding unauthorized transactions that might otherwise go undetected-calculated the average per-consumer cost of all

---

[33] 17 C.F.R. § 248.201 (2013).
[34] Victims of Identity Theft, 2014 (Sept. 2015) available at: http://www.bjs.gov/content/ pub/ pdf/vitl4.pdf.

unauthorized transactions at roughly US $215 per cardholder incurring these charges[35], some portion of which could go undetected and thus must be paid entirely out-of-pocket by consumer victims of account or identity misuse.

76.    As a direct and proximate result of Defendants' wrongful actions and inaction, Plaintiffs and Class Members have been placed at an imminent, immediate, and continuing increased risk of harm from identity theft and fraud. The U.S. Department of Justice's Bureau of Justice Statistics found that "among victims who had personal information used for fraudulent purposes, 29% spent a month or more resolving problems" and that "resolving the problems caused by identity theft [could] take more than a year for some victims."[36]

77.    The victims here-Plaintiffs and the Class-are no different, as they are faced with an arduous path to secure their PII in response to Capital One's negligence. Plaintiffs and the Class must take at least the following steps to attempt to prevent further misuse of their PII:

a.    Review and monitor credit card statements for any unusual or unknown charges;

b.    Contact their financial institution (which is not necessarily Capital One) to determine if there is any suspicious activity on their accounts;

c.    Change their account information;

d.    Place a fraud alert on their credit bureau reports;

---

[35] Hadley Malcom, Consumers Rack Up $14.3 Billion in Gray Charges, Research Study Commissioned For Billguard By Aite Research, USA Today (July 25, 2013), available at: https://www.usatoday.com/story/money/personalfinance/2013/07/25/consumers-unwanted- charges-in-billions/2568645/.

[36] U.S. Department of Justice, Office of Justice Programs Bureau of Justice Statistics, *Victims of Identity Theft, 2012,* December 2013 available at https://www.bjs.gov/content/pub/pdf/vit12.pdf (last visited August 10,2019).

e.       Place a security freeze on their credit bureau reports; and

f.       Periodically monitor their credit bureau reports for any unusual activity and check for accuracy.

78.      Additionally, there is commonly lag time between when harm occurs and when it is discovered and also between when PII is stolen and when it is used. According to the U.S. Government Accountability Office, which conducted a study regarding data breaches:

> [L]aw enforcement officials told us that in some cases, stolen data may be held for up to a year or more before being used to commit identity theft. Further, once stolen data have been sold or posted on the Web, fraudulent use of that information may continue for years. As a result, studies that attempt to measure the harm resulting from data breaches cannot necessarily rule out all future harm.

79.      There is a very strong probability that those impacted by Capital One's failure to secure their PII could be at risk of fraud and identity theft for extended periods of time.

80.      Thus, Plaintiffs and Class members now face years of constant surveillance of their financial and personal records, monitoring, and loss of rights. Plaintiffs and the Class are incurring and will continue to incur such damages in addition to any fraudulent credit and debit card charges incurred by them and the resulting loss of use of their credit and access to funds, regardless of whether such charges are ultimately reimbursed by banks and credit card companies.

**H. Plaintiffs and Class Members Suffered Damages**

81.      The PII of Plaintiffs and Class members are private and sensitive in nature and was left inadequately protected by Capital One. Capital One did not obtain Plaintiffs' and Class members' consent to disclose their PII to any other person as required by applicable law and industry standards.

82.      The Data Breach was a direct and proximate result of Capital One's failure

to properly safeguard and protect Plaintiffs' and Class members' PII from unauthorized access, use, and disclosure, as required by various state and federal regulations, industry practices, and the common law, including Capital One's failure to establish and implement appropriate administrative, technical, and physical safeguards to ensure the security and confidentiality of Plaintiffs' and Class members' PII to protect against reasonably foreseeable threats to the security or integrity of such information.

83.    Capital One had the resources to prevent a breach, but instead chose to put profit before consumers' privacy and protection of consumers' PII.

84.    Had Capital One remedied the deficiencies in its computer systems, followed federal and state guidelines, and adopted security measures recommended by experts in the field, Capital One would have prevented intrusion into its computer systems and, ultimately, the theft of its consumers' confidential PII.

85.    As a result of Capital One's wrongful actions, inaction, negligent security practices, and the resulting Data Breach, Plaintiffs and Class members have been placed at an imminent, immediate, and continuing increased risk of harm from identity theft and identity fraud, requiring them to take the time which they otherwise would have dedicated to other life demands such as work and family in an effort to mitigate the actual and potential impact of the Data Breach on their lives including, inter alia, by placing "freezes" and "alerts" with credit reporting agencies, contacting their financial institutions, closing or modifying financial accounts, closely reviewing and monitoring their credit reports and accounts for unauthorized activity, and filing police reports. This time has been lost forever and cannot be recaptured.

86.    Capital One's wrongful actions and inaction directly and proximately caused the theft and dissemination into the public domain of Plaintiffs' and Class members' PII, causing

them to suffer, and continue to suffer, economic damages and other actual harm for which they are entitled to compensation, including:

a.    theft of their personal and financial information;

b.    unauthorized charges on their debit and credit card accounts;

c.    the imminent and certainly impending injury flowing from potential fraud and identity theft posed by their personal information being placed in the hands of criminals and misused via the sale of Plaintiffs' and Class members' information on the Internet's black market;

d.    the untimely and inadequate notification of the Data Breach;

e.    the improper disclosure of their PU;

f.    loss of privacy;

g.    money paid to, and purchasing products from, Capital One's business during the Data Breach (e.g., paying interest on credit cards, paying minimum balance fees, and other banking fees), expenditures which Plaintiffs and Class members would not have made with Capital One had Capital One disclosed that it lacked computer systems and data security practices adequate to safeguard consumers, PII from theft;

h.    ascertainable losses in the form of out-of-pocket expenses and the value of their time reasonably incurred to remedy or mitigate the effects of the Data Breach;

i. ascertainable losses in the form of deprivation of the value of their PII, for which there is a well-established national and international market;

j. loss of use of, and access to, their account funds and costs associated with the inability to obtain money from their accounts or being limited in the amount of money they were permitted to obtain from their accounts, including missed payments on bills and loans,

late charges and fees, and adverse effects on their credit including adverse credit notations; and,

k. the loss of productivity and value of their time spent to address, attempt to ameliorate, mitigate, and deal with the actual and future consequences of the Data Breach, including finding fraudulent charges, cancelling and reissuing cards, purchasing credit monitoring and identity theft protection services, imposition of withdrawal and purchase limits on compromised accounts, and the inconvenience, nuisance and annoyance of dealing with all such issues resulting from the Data Breach.

87.    While Plaintiffs' and Class members' PII have been stolen, Capital One continues to hold PII of consumers, including Plaintiffs' and Class members' PII. Particularly because Capital One has demonstrated an inability to prevent a breach, Plaintiffs and Class members have an undeniable interest in ensuring that their PII is secure, remains secure, is properly and promptly destroyed, and is not subject to further theft.

## CLASS ACTION ALLEGATIONS

88.    Plaintiffs bring this action on behalf of themselves and as a class action under Federal Rules of Civil Procedure 23(a), (b)(2), (b)(3), and (c)(4), seeking damages and equitable relief on behalf of the following nationwide Class for which Plaintiffs seek certification:

All persons residing in the United States who applied for Capital One credit card products from 2005 through 2019 and whose PII was disclosed to unauthorized third parties (the "Nationwide Class").

89.    Additionally, Plaintiffs bring this action on behalf of state subclasses seeking damages and equitable relief on behalf of:

All persons residing in the State of Florida who applied for Capital One credit card products from 2005 through 2019 and whose PII was disclosed to unauthorized third parties (the "Florida Sub Class").

90.    Plaintiffs will also bring a subclass seeking damages and equitable relief on behalf of:

> All persons residing in the State of Virginia who applied for Capital One credit card products from 2005 through 2019 and whose PII was disclosed to unauthorized third parties (the "Virginia Sub Class").

91.    Excluded from the Classes are Capital One; any parent, affiliate, or subsidiary of Capital One; any entity in which Capital One has a controlling interest; any of Capital One's officers or directors; or any successor or assign of Capital One. Also excluded are any Judge or court personnel assigned to this case and members of their immediate families.

92.    Plaintiffs hereby reserve the right to amend or modify the class definitions with greater specificity or division after having had an opportunity to conduct discovery.

93.    **Numerosity. Fed. R. Civ. P. 23(a)(l).** Consistent with Rule 23(a)(l), the Classes are so numerous that joinder of all members is impracticable. While Plaintiffs do not know the exact number of the members of the Classes, Plaintiffs believe the Nationwide Class contains approximately 100 million people. Class members may be identified through objective means. Class members may be notified of the pendency of this action by recognized, Court-approved notice dissemination methods, which may include U.S. mail, electronic mail, internet postings, social media, and/or published notice.

94.    **Commonality. Fed. R. Civ. P. 23(a)(2) and (b)(3).** Consistent with Rule 23(a)(2) and with 23(b)(3)'s predominance requirements, this action involves common questions of law and fact exist as to all members of the Classes, and predominate over any questions affecting individual members of the Classes. Such questions of law and fact common to the Classes include, but are not limited to:

a.    Whether Capital One had a legal duty to implement and maintain reasonable

and adequate security procedures and practices for the protection of information it collected and stored from consumers who applied for Capital One credit card products;

  b.  Whether Capital One had a duty to adequately protect PII;

  c.  Whether and when Capital One knew or should have known of the susceptibility of its computer systems to a data breach;

  d.  Whether Capital One's security measures to protect its computer systems were reasonable in light of the FTC data security recommendations and best practices recommended by data security experts;

  e.  Whether Capital One engaged in the wrongful conduct alleged herein;

  f.  Whether Capital One was negligent in failing to implement reasonable and adequate security procedures and practices to protect the information it collected and stored from consumers who applied for Capital One credit card products;

  g.  Whether Capital One's failure to implement adequate data security measures resulted in or was the proximate cause of the Data Breach;

  h.  Whether Capital One's conduct, practices, actions, and/or omissions constituted unfair or deceptive trade practices;

  i.  Whether Capital One's conduct, including its failure to act, resulted in or was the proximate cause of the breach of its computer systems, resulting in the loss of the PII belonging to Plaintiffs and Class members;

  j. Whether Plaintiffs and Class members were injured and suffered damages or other losses because of Capital One's failure to reasonably protect its computer systems and data network; and

  k. Whether Plaintiffs and Class members are entitled to relief, including

equitable relief.

95.     **Typicality. Fed. R. Civ. P. 23(a)(3).** Consistent with rule 23(a)(3), Plaintiffs' claims are typical of the claims of the members of the Classes. Plaintiffs are consumers who provided PII to in order to apply for Capital One credit card products and had their PII compromised as a result of the Data Breach. Plaintiffs' damages and injuries are akin to other Class members, and Plaintiffs seek relief consistent with the relief of the Class members.

96.     **Adequacy. Fed. R. Civ. P. 23(a)(4).** Consistent with Rule 23(a)(4), Plaintiffs are adequate representatives of the Classes because Plaintiffs are members of the respective Classes and is committed to pursuing this matter against Capital One to obtain relief for the Classes. Plaintiffs have no conflicts of interest with either Class members. Plaintiffs' Counsel are competent and experienced in litigating class actions, including privacy litigation. Plaintiffs intend to vigorously prosecute this case and will fairly and adequately protect the Classes' interests. Plaintiffs' claims arise out of the 3 same common course of conduct giving rise to the claims of the other members of the Classes. Plaintiffs' interests are coincident with, and not antagonistic to, those of the other members of the Classes.

97.     **Superiority. Fed. R. Civ. P. 23(b)(3).** Consistent with Rule 23(b)(3), a class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action. The quintessential purpose of the class action mechanism is to permit litigation against wrongdoers even when damages to individual plaintiffs may not be sufficient to justify individual litigation. Here, the damages suffered by Plaintiffs and the Classes are relatively small compared to the burden and expense required to individually litigate their claims against Capital One, and thus, individual litigation to redress Capital One's wrongful conduct

would be impracticable. Individual litigation by each Class member would also strain the court system. Individual litigation creates the potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and the court system. By contrast, the class action device presents far fewer management difficulties and provides the benefits of a single adjudication, economies of scale, and comprehensive supervision by a single court.

98.     **Injunctive and Declaratory Relief.** Class certification is also appropriate under Rule 23(b)(2) and (c). Capital One, through its uniform conduct, acted or refused to act on grounds generally applicable to the Classes as a whole, making injunctive and declaratory relief appropriate to the Classes as a whole.

99.     Likewise, particular issues under Rule 23(c)(4) are appropriate for certification because such claims present only particular, common issues, the resolution of which would advance the disposition of this matter and the parties' interests therein. Such particular issues are set forth in Paragraphs [94(a)-(k)] above.

100.    Finally, all members of the proposed Classes are readily ascertainable. Capital One has access to information regarding the applications from consumers for the span of time from 2005 through 2019 and the consumers affected by the Data Breach. Using this information, Class members can be identified and their contact information ascertained for the purpose of providing notice to the Classes.

<u>**COUNT I**</u>
**Breach of Implied Contract**
**(On behalf of all Classes)**

101.    Plaintiffs restate and realleges paragraphs 1 through 100 as if fully set forth herein.

102.    Capital One solicited and invited Plaintiffs and Class members to apply for

credit card products by providing their PII. Plaintiffs and Class members accepted Capital One's offers and provided their PII to Capital One to apply for Capital One credit card products.

103.    When Plaintiffs and Class members applied Capital One credit card products, they provided their PII to Capital One. In so doing, Plaintiffs and Class members on the one hand, and Capital One on the other, entered into mutually agreed-upon implied contracts pursuant to which Plaintiffs and Class members agreed that their PII was valid, while Capital One agreed that it would use Plaintiffs' and Class members' PII in its possession for only the agreed-upon purpose of processing the credit card product application, and no other purpose.

104.    Implicit in the agreement to use the PII in its possession for only the agreed-upon application and no other purpose was the obligation that Capital One would use reasonable measures to safeguard and protect the PII of Plaintiffs and Class members in its possession.

105.    By accepting PII for credit card product applications, Capital One assented to and confirmed its agreement to reasonably safeguard and protect Plaintiffs' and Class members' PII from unauthorized disclosure or uses and to timely and accurately notify Plaintiffs and Class members if their data had been breached and/or compromised.

106.    Plaintiffs and Class members would not have provided and entrusted their PII to Capital One to apply for the Capital One credit card products in the absence of the implied contract between them and Capital One.

107.    Plaintiffs and Class members fully performed their obligations under the implied contracts with Capital One.

108.    Capital One breached the implied contracts it made with Plaintiffs and Class members by failing to safeguard and protect Plaintiffs' and Class members' PII, and by failing to

provide timely and accurate notice to them that their PII was compromised as a result of the Data Breach.

109.    Capital One breached the implied contracts it made with Plaintiffs and Class members by failing to ensure that Plaintiffs' and Class members' PII in its possession was used only for the agreed-upon application verification and no other purpose.

110.    Plaintiffs and Class members conferred a monetary benefit on Capital One which has accepted or retained that benefit. Specifically, the credit card products typically carry annual fees and other charges (e.g. interest) for use.  In exchange, Plaintiffs and Class members should have received the services that were the subject of the transaction and should have been entitled to have Capital One protect their PII with adequate data security measures.

111.    Capital One failed to secure Plaintiffs' and Class members' PII and, therefore, did not provide full compensation for the benefit Plaintiffs and Class members provided.

112.    Capital One acquired the PII through inequitable means when it failed to disclose the inadequate security practices previously alleged.

113.    If Plaintiffs and Class members had known that Capital One would employ inadequate security measures to safeguard PII, they would not have applied for the Capital One credit card products.

114.    As a direct and proximate result of Capital One's breaches of the implied contracts between Capital One on the one hand, and Plaintiffs and Class members on the other, Plaintiffs and Class members sustained actual losses and damages as described in detail above.

115.    Plaintiffs and Class members were harmed as the result of Capital One's breach of the implied contracts because their PII was compromised, placing them at a greater risk of identity theft and subjecting them to identity theft, and their PII was disclosed to third

parties without their consent. Plaintiffs and Class members also suffered diminution in value of their PII in that it is now easily available to hackers on the dark web. Plaintiffs and the Class have also suffered consequential out-of-pocket losses for procuring credit freeze or protection services, identity theft monitoring, late fees, bank fees, and other expenses relating to identity theft losses or protective measures. The Class members are further damaged as their PII remains in the hands of those who obtained it without their consent.

116.    This breach of implied contracts was a direct and legal cause of the injuries and damages to Plaintiffs and Class members as described above.

## COUNT II
### Negligence
### (On behalf of all Classes)

117.    Plaintiffs restate and realleges paragraphs 1 through 100 as if fully set forth herein.

118.    Capital One solicited and took possession of Plaintiffs' and the Class members' PII, and Capital One had a duty to exercise reasonable care in securing that information from unauthorized access or disclosure. Capital One further had a duty to destroy Plaintiffs' and Class members' PII within an appropriate amount of time after it was no longer required by Capital One, in order to mitigate the risk of such non-essential PII being compromised in a data breach.

119.    Upon accepting and storing Plaintiffs' and Class members' PII in its computer systems and on its networks, Capital One undertook and owed a duty of care to Plaintiffs and Class members to exercise reasonable care to secure and safeguard Plaintiffs' and Class members' PII and to use commercially-reasonable methods to do so. Capital One knew that

the PII was private and confidential, and should be protected as private and confidential.

120.    Capital One owed a duty of care not to subject Plaintiffs and Class members, along with their PII, to an unreasonable risk of harm because they were foreseeable and probable victims of any inadequate security practices.

121.    Capital One owed a duty of care to Plaintiffs and Class members to quickly detect a data breach and to timely act on warnings about data breaches.

122.    Capital One's duties arose from its relationship to Plaintiffs and Class members and from industry custom.

123.    Capital One, through its actions and/or failures to act, unlawfully breached duties to Plaintiffs and Class members by failing to implement standard industry protocols and to exercise reasonable care to secure and keep private the PII entrusted to it.

124.    Capital One, through its actions and/or failures to act, allowed unmonitored and unrestricted access to unsecured PII.

125.    Capital One, through its actions and/or failures to act, failed to provide adequate supervision and oversight of the PII with which it was entrusted, despite knowing the risk and foreseeable likelihood of a breach and misuse, which permitted unknown third parties to gather Plaintiffs' and Class members' PII, misuse that PII, and intentionally disclose it to unauthorized third parties without consent.

126.    Capital One knew, or should have known, the risks inherent in collecting and storing PII, the importance of adequate security and the well-publicized data breaches within the financial services industry.

127.    Capital One knew, or should have known, that its data systems and networks did not adequately safeguard Plaintiffs' and Class members' PII.

128.    Due to Capital One's knowledge that a breach of its systems would damage millions of its customers, including Plaintiffs and Class members, Capital One had a duty to adequately protect its data systems and the PII contained thereon.

129.    Capital One had a special relationship with Plaintiffs and Class members. Plaintiffs' and Class members' willingness to entrust Capital One with their PII was predicated on the understanding that Capital One would take adequate security precautions to safeguard that information. Moreover, only Capital One had the ability to protect its systems and the PII stored on those systems from attack.

130.    Capital One's own conduct also created a foreseeable risk of harm to Plaintiffs and Class members and their PII. Capital One's misconduct included failing to: (1) secure its computer systems, despite knowing their vulnerabilities; (2) comply with industry standard security practices; (3) implement adequate system and event monitoring; and (4) implement the systems, policies, and procedures necessary to prevent this type of data breach.

131.    Capital One also had independent duties under federal laws that required Capital One to reasonably safeguard Plaintiffs' and Class members' PII, and promptly notify them about the Data Breach.

132.    Capital One breached its duties to Plaintiffs and Class members in numerous ways, including:

a.    by failing to provide fair, reasonable, or adequate computer systems and data security practices to safeguard Plaintiffs' and Class members' Customer Data;

b.    by creating a foreseeable risk of harm through the misconduct previously described;

c.    by failing to implement adequate security systems, protocols, and practices

sufficient to protect Plaintiffs' and Class members' PII before and after learning of the Data Breach;

d.       by failing to comply with industry standard data security standards during the period of the Data Breach; and

e.       by failing to timely and accurately disclose that Plaintiffs' and Class members' PII had been improperly acquired or accessed.

133.    Through Capital One's acts and omissions described in this Complaint, including Capital One's failure to provide adequate security and its failure to protect Plaintiffs' and Class members' PII from being foreseeably captured, accessed, disseminated, stolen, and misused, Capital One unlawfully breached its duty to use reasonable care to adequately protect and secure Plaintiffs' and Class members' PII while it was within Capital One's possession or control.

134.    The law further imposes an affirmative duty on Capital One to timely disclose the unauthorized access and theft of Plaintiffs' and Class members' PII, so that Plaintiffs and Class members can take appropriate measures to mitigate damages, protect against adverse consequences, and thwart future misuse of their PII.

135.    Capital One breached its duty to notify Plaintiffs and Class Members of the unauthorized access to their PII by waiting to notify Plaintiffs and Class members, and then by failing to provide Plaintiffs and Class members sufficient information regarding the breach.

136.    Through Capital One's acts and omissions described in this Complaint, including Capital One's failure to provide adequate security and its failure to protect Plaintiffs' and Class members' PII from being foreseeably captured, accessed, disseminated, stolen, and misused, Capital One unlawfully breached its duty to use reasonable care to adequately protect and secure Plaintiffs' and Class members' PII while it was within Capital One's possession or

control.

137.    Further, through its failure to provide timely and clear notification of the Data Breach to consumers, Capital One prevented Plaintiffs and Class members from taking meaningful, proactive steps to secure their financial data and bank accounts.

138.    Upon information and belief, Capital One improperly and inadequately safeguarded Plaintiffs' and Class members' PII in deviation of standard industry rules, regulations, and practices at the time of the unauthorized access. Capital One's failure to take proper security measures to protect sensitive PII as described in this Complaint, created conditions conducive to a foreseeable, intentional criminal act, namely the unauthorized access of Plaintiffs' and Class members' PII.

139.    Capital One's conduct was grossly negligent and departed from all reasonable standards of care, including, but not limited to: failing to adequately protect the PII; failing to conduct regular security audits; failing to provide adequate and appropriate supervision of persons having access to Plaintiffs' and Class members' PII; and failing to provide Plaintiffs and Class members with timely and sufficient notice that their sensitive PII had been compromised.

140.    Neither Plaintiffs nor the other Class members contributed to the Data Breach and subsequent misuse of their PII as described in this Complaint

141.    Capital One's failure to exercise reasonable care in safeguarding PII by adopting appropriate security measures, including proper encryption storage techniques, was the direct and proximate cause of Plaintiffs' and Class members' PII being accessed and stolen through the data breach.

142.    Capital One  breached its duties to Plaintiffs and Class members by failing to provide  fair, reasonable, and adequate computer systems and data security practices to safeguard

Plaintiffs' and Class members' PII.

143.    As a result of Capital One's breach of duties, Plaintiffs and the Class suffered damages including, but not limited to: damages from lost time and effort to mitigate the actual and potential impact of the Data Breach on their lives including, inter alia, by placing "freezes" and "alerts" with credit reporting agencies, contacting their financial institutions, closing or modifying financial accounts, closely reviewing and monitoring their credit reports and accounts for unauthorized activity, and filing police reports, and damages from identity theft, which may take months if not years to discover and detect, given the far-reaching, adverse and detrimental consequences of identity theft and loss of privacy. The nature of other forms of economic damage and injury may take years to detect, and the potential scope can only be assessed after a thorough investigation of the facts and events surrounding the theft mentioned above.

## COUNT III
### Negligence *Per Se*
### (On behalf of all Classes)

144.    Plaintiffs restate and realleges paragraphs 1 through 100 as if fully set forth herein.

145.    Section 5 of the FTC Act prohibits "unfair . . .practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair act or practice by businesses, such as Capital One, of failing to use reasonable measures to protect PII. The FTC publications and orders described above also form part of the basis of Capital One's duty in this regard.

146.    Capital One violated Section 5 of the FTC Act by failing to use reasonable measures to protect PII, and not complying with applicable industry standards, as described in detail herein. Capital One's conduct was particularly unreasonable given the nature and amount of PII it obtained and stored; and the foreseeable consequences of a data breach including,

specifically, the immense damages that would result to Plaintiffs and Class members.

147.    Capital One's violation of Section 5 of the FTC Act constitutes negligence *per se*.

148.    Plaintiffs and Class members are within the class of persons that the FTC Act was intended to protect.

149.    The harm that occurred as a result of the Data Breach is the type of harm the FTC Act was intended to guard against. The FTC has pursued enforcement actions against businesses, which, as a result of their failure to employ reasonable data security measures and avoid unfair and deceptive practices, caused the same harm as that suffered by Plaintiffs and the Class.

150.    As a direct and proximate result of Capital One's negligence *per se,* Plaintiffs and the Class have suffered, and continue to suffer, injuries and damages arising from identity theft; damages from lost time and effort to mitigate the actual and potential impact of the Data Breach on their lives, including, *inter alia,* by placing "freezes" and "alerts" with credit reporting agencies, contacting their financial institutions, closing or modifying financial accounts, closely reviewing and monitoring their credit reports and accounts for unauthorized activity, and filing police reports, and damages from identity theft, which may take months if not years to discover and detect, given the far-reaching, adverse and detrimental consequences of identity theft and loss of privacy.

151.    Additionally, as a direct and proximate result of Capital One's negligence *per se,* Plaintiffs and Class members have suffered and will suffer the continued risks of exposure of their PII, which remain in Capital One's possession and is subject to further unauthorized disclosures so long as Capital One fails to undertake appropriate and adequate measures to

protect the PII in its continued possession.

## COUNT IV
### Unjust Enrichment
### (On behalf of all Classes)

152.    Plaintiffs restate and realleges paragraphs 1 through 100 as if fully set forth herein.

153.    Plaintiffs and members of the Class conferred a monetary benefit on Capital One. Specifically, they provided and entrusted their PII to Capital One.

154.    In exchange, Plaintiffs and Class members should have been entitled to have Capital One protect their PII with adequate data security.

155.    Capital One appreciated, accepted, and retained the benefit bestowed upon it under inequitable and unjust circumstances arising from Capital One's conduct toward Plaintiffs and Class Members as described herein; Plaintiffs and Class members conferred a benefit on Capital One and accepted or retained that benefit. Capital One used Plaintiffs' and Class members' PII for business purposes.

156.    Capital One failed to secure Plaintiffs' and Class members' PII and, therefore, did not provide full compensation for the benefit Plaintiffs and Class members provided.

157.    Capital One acquired the PII through inequitable means in that it failed to disclose the inadequate security practices previously alleged, as well as failing to destroy or otherwise purge the PII from its computer systems after Capital One no longer had a legitimate business purpose to maintain that PII.

158.    If Plaintiffs and Class members knew that Capital One would not secure their PII using adequate security, they would not have applied for Capital One credit card products.

159.    Plaintiffs and Class members have no adequate remedy at law.

160.    Under the circumstances, it would be unjust for Capital One to be permitted to retain any of the benefits that Plaintiffs and Class members conferred on it.

161.    Under the principles of equity and good conscience, Capital One should not be permitted to retain the PII belonging to Plaintiffs and Class members because Capital One failed to implement the data management and security measures that industry standards mandate.

162.    Capital One should be compelled to disgorge into a common fund or constructive trust, for the benefit of Plaintiffs and Class members, proceeds that it unjustly received from them. In the alternative, Capital One should be compelled to refund the amounts that Plaintiffs and Class members overpaid for security they did not receive.

### COUNT V
### Breach of Fiduciary Duty
### (On behalf of all Classes)

163.    Plaintiffs restate and realleges paragraphs 1 through 100 as if fully set forth herein.

164.    Defendants owed a fiduciary duty to Plaintiffs and Class members after Plaintiffs and Class members trusted Capital One, one of the world's largest financial institution, with their PII and finances.

165.    Defendants solicited from Plaintiffs' and Class Members' PII, in order to use Capital One products.

166.    Plaintiffs and Class members were under the impression that Defendants would protect their PII from unauthorized disclosure.

167.    Upon soliciting and obtaining Plaintiffs' and Class Members' PII, Defendants

had a duty to safeguard the information.

168.    Defendants were in a position of trust as an institution that claimed it would protect Plaintiffs' and Class Members' PII.

169.    Defendants breached their fiduciary duties to Plaintiffs and Class Members in that, among other breaches, Defendants:

    a.   Failed to properly safe guard Plaintiffs' and Class Members' PII;

    b.   Failed to implement adequate security systems, protocols, and practices sufficient to protect Plaintiffs' and Class members' PII before and after learning of the Data Breach;

    c.   Failed to timely detect the Data Breach;

    d.   Failed to comply with industry standard data security standards during the period of the Data Breach; and

    e.   Failed to time inform Plaintiffs and Class Members that their PII has been compromised.

170.    As a direct and proximate cause of Capital One's actions and/or omissions, Plaintiffs and Class Members have suffered damages.

171.    But for Capital One's disclosure of Plaintiffs' and Class Members' PII in violation of their Fiduciary duty, Plaintiffs' and Class Members' PII would not have been compromised, stolen, viewed, accessed, and used by unauthorized third parties. Capital One's Data Breach was the direct and legal cause of the theft of Plaintiffs' and Class Members' PII, as well as the resulting damages.

172.    As a direct and proximate result of Capital One's breaches of their fiduciary duty, Plaintiffs and the Class have suffered, and continue to suffer, injuries and damages

arising from identity theft; damages from lost time and effort to mitigate the actual and potential impact of the Data Breach on their lives, including, *inter alia,* by placing "freezes" and "alerts" with credit reporting agencies, contacting their financial institutions, closing or modifying financial accounts, closely reviewing and monitoring their credit reports and accounts for unauthorized activity, and filing police reports, and damages from identity theft, which may take months if not years to discover and detect, given the far-reaching, adverse and detrimental consequences of identity theft and loss of privacy, and will continue to incur injury and suffer economic and non-economic losses.

<u>**COUNT VI**</u>

**Florida's Deceptive and Unfair Trade Practices Act ("FDUTPA")**
**(on behalf Florida subclass)**

173.    Plaintiff Tester ("Plaintiff," for purposes of this Count), individually and on behalf of the other Florida Subclass Members, restates and reallege paragraphs 1 through 100 as if fully set forth herein

174.    Section 501.203(8), Florida Statutes defines "Trade or Commerce" as:

[T]he advertising, soliciting, providing, offering, or distributing, whether by sale, rental, or otherwise, of any good or service, or any property, whether tangible or intangible, or any other article, commodity, or thing of value, wherever situated. "Trade or Commerce" shall include the conduct of any trade or commerce, however denominated, including any nonprofit or not-for-profit person or activity.

175.    The Defendants, by provided credit card and other financial services in Florida, including to Plaintiff, is "Trade or Commerce" within the meaning of section 501.203(8), Florida Statutes.

176.    Section 501.204(1) provides that: "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful."

177. Capital One operating in Florida engaged in unfair and deceptive practices in violation of Florida Statutes section 501.204 by engaging in one or more of the following acts:

a. Failing to enact adequate privacy and security measures to protect the Florida Subclass Members' Personal Information from unauthorized disclosure, release, data breaches, and theft, which was a direct and proximate cause of the Capital One Data Breach;

b. Failing to take proper action following known security risks and prior cybersecurity incidents, which was a direct and proximate cause of the Capital One Data Breach;

c. Knowingly and fraudulently misrepresenting that it would maintain adequate data privacy and security practices and procedures to safeguard the Florida Subclass Members' Personal Information from unauthorized disclosure, release, data breaches, and theft;

d. Omitting, suppressing, and concealing the material fact of the inadequacy of its privacy and security protections for the Florida Subclass Members' Personal Information;

e. Knowingly and fraudulently misrepresenting that it would comply with the requirements of relevant federal and state laws pertaining to the privacy and security of the Florida Subclass Members' Personal Information;

f. Failing to maintain the privacy and security of the Florida Subclass Members' Personal Information, in violation of duties imposed by applicable federal and state laws, including but not limited to those mentioned in the aforementioned paragraph, directly and proximately causing the Capital One Data Breach; and

g. Failing to disclose the Capital One Data Breach to the Florida Subclass Members in a timely and accurate manner.

178. As a direct and proximate result of Capital One's practices, the Florida Subclass

Members suffered injury and/or damages, including but not limited to time and expenses related to monitoring their financial accounts for fraudulent activity, an increased, imminent risk of fraud and identity theft, and loss of value of their Personal Information.

179.    The above unfair and deceptive acts and practices by Capital One were immoral, unethical, oppressive, and unscrupulous. These acts caused substantial injury to the Florida Subclass Members that they could not reasonably avoid; this substantial injury outweighed any benefits to consumers or to competition.

180.    Capital One knew or should have known that its computer systems and data security practices were inadequate to safeguard the Florida Subclass Members' Personal Information and that risk of a data breach or theft was high. Capital One's actions in engaging in the above-named unfair practices and deceptive acts were negligent, knowing, and willful.

181.    Plaintiff demands, individually and on behalf of the Florida subclass: actual damages, including any reimbursement of funds spent in connection with the Data Breach; pre and post-judgment interest; an award of attorneys' fees based upon Fla. Stat. § 501.2105, all costs; and, any and all such further relief as this Court deems just and proper.

## COUNT VII
### Virginia Consumer Protection Act
### (on behalf Virginia subclass)

182.    Plaintiff Masi ("Plaintiff," for purposes of this Count), individually and on behalf of the other Virginia Subclass Members, restates and realleges paragraphs 1 through 100 as if fully set forth herein.

183.    This is an action for relief under Virginia Code § 59.1-196, *et seq.*, pursuant to the Virginia Consumer Protection Act.

184.    Virginia Code § 59.1-198 defines "Consumer transaction" as "[t]he

advertisement, sale, lease, license or offering for sale, lease or license, of goods or services to be used primarily for personal, family or household purposes." Furthermore, "Services" is defined as "includ[ing] but not limited to (i) work performed in the business or occupation of the supplier, (ii) work performed for the supplier by an agent whose charges or costs for such work are transferred by the supplier to the consumer or purchaser as an element of the consumer transaction…"

185.    Virginia Code § 59.1-200(14) prohibits "[u]sing any other deception, fraud, false pretense, false promise, or misrepresentation in connection with a consumer transaction."

186.    The advertising, soliciting, providing, offering, and supplying of credit services by the Defendants to the Plaintiff constitutes acts by a supplier under the Virginia Consumer Protection Act.

187.    Virginia Code § 5.91-200(A) provides that "[t]he following fraudulent acts or practices committed by a supplier in connection with a consumer transaction are hereby declared unlawful:

    a.  Misrepresenting the source, sponsorship, approval or certification of goods or services;

    b.  Misrepresenting the affiliation, connection, or association of the supplier, or of the goods or services, with another;

    c.  Misrepresenting that goods or services have certain quantities, characteristics, ingredients, uses, or benefits;

    d.  Misrepresenting that goods or services are of a particular standard, quality, grade, style or model;

    e.  Using any other deception, fraud, false pretense, false promise, or

misrepresentation in connection with a consumer transaction.

188.    The Plaintiff has suffered actual damage as a result of the Defendants' violations of the aforementioned provisions of the Virginia Consumer Protection Act for which she is entitled to relief under Virginia Code § 59.1-204, 205, 206 and/or 207.

## COUNT VIII
### Declaratory Judgment
### (On behalf of Classes)

189.    Plaintiffs restate and realleges paragraphs 1 through 100 as if fully set forth herein.

190.    This is a count for injunctive and declaratory relief pursuant to 28 U.S.C. §§ 2201-2202.

191.    Section 28 U.S.C. § 2201 provides in relevant part:

> In a case of actual controversy within its jurisdiction … any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought. Any such declaration shall have the force and effect of a final judgment or decree and shall be reviewable as such.

192.    28 U.S.C. § 2202 provides: "Further necessary or proper relief based on a declaratory judgment or decree may be granted, after reasonable notice and hearing, against any adverse party whose rights have been determined by such judgment."

193.    As previously alleged, Plaintiffs and Class members entered into an implied contract that required Capital One to provide adequate security for the PII it collected from their applications for Capital One credit card products. As previously alleged, Capital One owes duties of care to Plaintiffs and Class members that require it to adequately secure PII.

194.    Capital One still possesses PII pertaining to Plaintiffs and Class members.

195.    Capital One has not announced or otherwise notified Plaintiffs and Class members that their PII is sufficiently protected or, more importantly, expunged from Capital One's servers so as to prevent any further breaches or compromises.

196.    Indeed, Capital One has stated that PII from Capital One credit card product applications submitted as far back as 2005 is subject to the Data Breach.

197.    Accordingly, Capital One has not satisfied its contractual obligations and legal duties to Plaintiffs and Class members. In fact, now that Capital One's lax approach towards data security has become public, the PII in its possession is more vulnerable than before.

198.    Actual harm has arisen in the wake of the Data Breach regarding Capital One's contractual obligations and duties of care to provide data security measures to Plaintiffs and Class members.

199.    Plaintiffs, therefore, seek a declaration that: (a) Capital One's existing data security measures do not comply with its contractual obligations and duties of care; and (b) in order to comply with its contractual obligations and duties of care, Capital One must implement and maintain reasonable security measures, including, but not limited to:

a.    engaging third-party security auditors/penetration testers as well as internal security personnel to conduct testing, including simulated attacks, penetration tests, and audits on Capital One's systems on a periodic basis, and ordering Capital One to promptly correct any problems or issues detected by such third-party security auditors;

b.    engaging third-party security auditors and internal personnel to run automated security monitoring;

c.    auditing, testing, and training its security personnel regarding any new or modified procedures;

d.      segmenting customer data by, among other things, creating firewalls and access controls so that if one area of Capital One is compromised, hackers cannot gain access to other portions of Capital One's systems;

e.      purging, deleting, and destroying PII not necessary for its provisions of services in a reasonably secure manner;

f.      conducting regular database scans and security checks;

g.      routinely and continually conducting internal training and education to inform internal security personnel how to identify and contain a breach when it occurs and what to do in response to a breach; and

h.      educating its customers about the threats they face as a result of the loss of their financial and personal information to third parties, as well as the steps Capital One's customers should take to protect themselves.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, on behalf of themselves, the Class and sub-classes, respectfully seeks from the Court the following relief:

a.      Certification of the Classes as requested herein;

b.       Appointment of Plaintiffs as Class representative and their undersigned counsel as Class counsel;

c.       Award Plaintiffs and members of the proposed Class damages;

d.       Award Plaintiffs and members of the proposed Class equitable, injunctive and declaratory relief, including the enjoining of Capital One's insufficient data protection practices at issue herein and Capital One's continuation of its unlawful business practices as alleged herein;

e.	An order declaring that Capital One's acts and practices with respect to the safekeeping of PII are negligent;

f.	Award Plaintiffs and members of the proposed Class pre-judgment and post- judgment interest as permitted by law;

g.	Award Plaintiffs and members of the proposed Class reasonable attorney fees and costs of suit, including expert witness fees; and

h.	Award Plaintiff and members of the proposed Class any further relief the Court deems proper.

## **JURY DEMAND**

Plaintiffs, on behalf of themselves, the Class and sub-classes, hereby demands a trial by jury on all issues so triable pursuant to Rule 23 of the Federal Rules of Civil Procedure.

Dated: August 13, 2019

Respectfully submitted,

By:___/s/ Jeffrey A. Breit_____
Jeffrey A. Breit, Esq. (VSB#18876)
Jeffrey@breitcantor.com
Kevin Biniazan, Esq. (VSB#92109)
kbiniazan@breitcantor.com
BREIT CANTOR GRANA BUCKNER, PLLC
Towne Pavilion Center II
600 22nd Street, Suite 402
Virginia Beach, VA 23451
Phone: (757) 622-6000
Facsimile: (757) 670-3939

Irvin V. Cantor, Esquire (VSB No. 17870)
Breit Cantor Grana Buckner, PLLC
7130 Glen Forest Drive, Suite 400
Richmond, Virginia  23226
Telephone:  (804) 644-1400
Facsimile:  (804) 644-9205
icantor@breitcantor.com

/s/ Patrick S. Montoya, Esq.
Lewis "Mike" S. Eidson, Jr.*
Fla. Bar. No. 151088
Email: Mike@colson.com
Julie Braman Kane*
Fla. Bar. No. 980277
Email: Julie@colson.com
Patrick Shanan Montoya*
Fla. Bar No. 0524441
Email: Patrick@colson.com
Colson Hicks Eidson
255 Alhambra Circle, PH
Coral Gables, FL  33134-2351
Telephone:  (305) 476-7400
Facsimile:  (305) 476-7444
*pro hac vice applications forthcoming

Counsel for Plaintiffs